**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0626n.06**

**No. 13-4324**


**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JONATHAN KEITH BLAZEK,

      Plaintiff-Appellant,

and

DONNA BLAZEK,

      Plaintiff,

v.

CITY OF LAKEWOOD, OHIO,

      Defendant-Appellee.

FILED
Aug 13, 2014
DEBORAH S. HUNT, Clerk

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO**


**BEFORE:** **BOGGS, CLAY, and GILMAN, Circuit Judges.**

      **CLAY, Circuit Judge.** Plaintiff Jonathan Blazek appeals from the district court's grant of summary judgment in favor of Defendant, the City of Lakewood, Ohio, on Plaintiff's claim of discrimination and failure to accommodate in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, *amended by the* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. For the reasons set forth below, we **AFFIRM** the district court in full.

## BACKGROUND

Plaintiff began working for Defendant in May 1988. Over the years, Plaintiff held several positions that required him to maintain a Commercial Driver's License ("CDL"). In 2010, Plaintiff took a job in streets, construction, maintenance, and repair ("SCMR"). Plaintiff's job in SCMR followed a seasonal cycle. "Fall time was leaf pick-up. Wintertime was snow removal. And then in the winter, we would do Christmas tree pick-up after the holidays." (R. 18, Blazek Dep., at 112.) Other times, Plaintiff worked laying and repairing asphalt. The job required Plaintiff to operate many types of trucks, including trucks for snow-plowing and salting. As a result, possessing a CDL was a central requirement of the SCMR position.

Plaintiff's twenty-plus years of employment with Defendant came to an end in March 2012. On March 13, 2012, Plaintiff arrived for the day's second shift, which began at 4:00 p.m., with a 21-ounce bottle filled with Canadian Mist whiskey stashed in his truck. Plaintiff spent the first part of his shift moving firewood and loading a dumpster before his lunch break began at about 7:00 p.m. Plaintiff admits that he could easily have been assigned a driving job after lunch. But despite this possibility, Plaintiff went to his truck and drank the entire bottle of whiskey he had brought from home. To put this in perspective, a shot of whiskey contains about 1.5 ounces, meaning that Plaintiff drank the equivalent of 14 shots of liquor over his lunch break.

After the lunch break ended at about 8:00 p.m., a short meeting of the SCMR workers was convened by Jean Yousefi, Defendant's director of human resources. The winter had been a mild one, and the SCMR workers had thought they could stop having extra shifts earlier than usual. But Yousefi had an ulterior motive for calling the meeting. Yousefi had received a tip the week before that Plaintiff had been drinking on the job. During the meeting, Yousefi noticed that Plaintiff "was acting suspiciously. He had bloodshot eyes and alcohol on his breath and

was, you know, in a euphoric type of mood." (R. 19, Yousefi Dep., at 201.) When the meeting broke up, Yousefi asked Plaintiff to step outside with her. Yousefi then asked Plaintiff if he had been drinking. Plaintiff said no, but Yousefi insisted that the two go to the local police station so Plaintiff could take a Breathalyzer. Once the two arrived at the station, Plaintiff told Yousefi that he had been drinking before he arrived at work—an untrue statement.

Plaintiff took the Breathalyzer at approximately 9:15 p.m. He blew a 0.132, 65% more than Ohio's legal limit, *see* Ohio Rev. Code 4511.19(A)(1)(d), and more than three times the limit for CDL drivers. *See* 49 C.F.R. § 382.201. Once Plaintiff had taken the Breathalyzer, Yousefi told him that she would like to have a drug test performed at the local hospital. Plaintiff then told Yousefi that he was taking Suboxone, a drug designed to help people wean themselves from opiate dependence. This was the first time Plaintiff had disclosed this prescription to his employer.

Yousefi and Plaintiff ended the night sitting by some picnic tables behind the SCMR garage. Plaintiff tearfully asked Yousefi if he would be fired. Yousefi could not say, and only recommended that Plaintiff go to an Alcoholics Anonymous meeting or contact the Employee Assistance Program as soon as possible.

This was not the first time alcohol had interfered with Plaintiff's life. Plaintiff picked up a DUI in 1986—a fact he disclosed in his 1989 application for employment with Defendant. In August 2007, Plaintiff was again charged with driving under the influence, although Plaintiff later pleaded guilty to the reduced charge of reckless operation of a motor vehicle. Plaintiff's plea required him to complete a four-tier Mothers Against Drunk Driving program. According to Plaintiff, his drinking problem worsened in the late 2000s when his son left home to attend college. Not only did Plaintiff simply miss his son, but the financial strains of sending his son to

college were opening rifts between Plaintiff and his wife. Indeed, Plaintiff and his wife had fought about money on March 13, 2012, just before Plaintiff left for his shift with a bottle of whiskey.

On March 14, 2012, Yousefi wrote a letter to Plaintiff notifying him of a pre-disciplinary meeting that would take place later that week. Yousefi charged Plaintiff with being intoxicated at work, driving a city vehicle while intoxicated, drinking at work, possessing alcohol on City property, and failing to report the use of prescriptions containing controlled substances. All of these acts violated Defendant's policy on drugs and alcohol in the workplace. Possessing or consuming alcohol on City property constituted a fireable offense—even for a first-time violator.

But Plaintiff was not a first-time violator. At the pre-disciplinary hearing, Plaintiff admitted that he had drunk "at work and/or drove City vehicles, on a handful of occasions in the [preceding] several months. . . . This includes driving a snowplow under the influence during a snow storm." (R. 18, Blazek Dep., at 189.) The hearing panel considered Plaintiff's actions "completely irresponsible and dangerous. You put your safety, the safety of our citizens and the safety of your co-workers in jeopardy on each of these occasions." (*Id.*) Plaintiff was terminated effective April 2, 2012—a date Defendant selected to allow Plaintiff to seek treatment. Plaintiff avers that he has since sought out-patient treatment for his alcoholism, is pursuing a twelve-step program, and has stayed sober.

After his termination, Plaintiff sought reinstatement through his union, which filed a grievance for wrongful termination on March 19, 2012. An arbitrator convened two hearings—on August 20 and September 14, 2012. At one of the hearings, Plaintiff asked for an accommodation for the first time. Specifically, Plaintiff requested to either be transferred to a non-driving position, or to receive a "Last Chance Agreement." A Last Chance Agreement is

essentially an addendum to an employment contract, under which the employee agrees to certain conditions (such as not drinking) in exchange for being allowed to return to work after committing a fireable offense. Defendant did not offer Plaintiff either of these options, and on December 27, 2012, the arbitrator denied the union's grievance.

As Plaintiff pursued his union grievance, he also filed a charge of discrimination with the EEOC and the Ohio Civil Rights Commission. Neither entity pursued Plaintiff's claims. Plaintiff and his wife initiated this suit on November 4, 2012. Their complaint stated five causes of action: (1) ADA discrimination, (2) disability discrimination in violation of the Ohio Civil Rights Act, (3) negligent infliction of emotional distress, (4) wrongful discharge, and (5) loss of consortium (the only claim that concerned Plaintiff's wife). After discovery, Defendant moved for summary judgment, and the district court granted the motion in full. *Blazek v. City of Lakewood*, No. 12 CV 2749, 2013 WL 5566678 (N.D. Ohio Oct. 9, 2013). Plaintiff timely appealed.[1]

**DISCUSSION**

Plaintiff asserts that Defendant violated the ADA in two ways—by firing him, and by failing to accommodate his disability, alcoholism.[2] The district court granted summary judgment to Defendant on both theories. We review this decision *de novo*. *See Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 955 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]Plaintiff's wife did not appeal, and Plaintiff himself has briefed only his ADA claims. To the extent Plaintiff's other claims are analyzed similarly to his ADA claims, they fail for the same reasons discussed below. To the extent Plaintiff's other claims are different, they have been waived. *See Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013).

[2]Plaintiff also raises a free-standing disparate treatment claim. Insofar as this claim is legally distinct from his termination and failure-to-accommodate claims, it fails because Plaintiff cannot show that similarly situated non-disabled employees were treated differently from him.

judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga Cnty. Probate Ct.,* 392 F.3d 151, 157 (6th Cir. 2004).

## I.    TERMINATION

As it now reads, the ADA prohibits employers from discriminating against qualified individuals "on the basis of disability." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, courts analyze ADA discrimination claims following the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "To prove a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation," and (3) a causal link ties the disability to the adverse employment action. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). Alcoholism can constitute a disability under the ADA. *See Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184–85 (6th Cir. 1997). "Once Plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a nondiscriminatory legitimate reason for the termination. Provided that the employer meets this burden, Plaintiff must then show that the proffered reason is but a pretext for discrimination." *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 310 (6th Cir. 2000) (citation omitted).

We assume without deciding that Plaintiff has established a prima facie claim, shifting the onus to Defendant to articulate a legitimate reason for Plaintiff's termination. Defendant has done so. Plaintiff violated Defendant's policies against possessing and consuming alcohol in the workplace, and admitted to doing so on numerous occasions. This is a legitimate,

nondiscriminatory reason for firing Plaintiff. *See Mararri*, 130 F.3d at 1183; *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 847–48 (6th Cir. 1995), *overruled on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc).

At this point, the burden shifts back to Plaintiff to create a genuine factual dispute that Defendant's proffered justification was a pretext to mask discrimination. Plaintiff can do this by showing "either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996). Plaintiff's only evidence of pretext are the records of fifteen employees of Defendant who received Last Chance Agreements following incidents involving drugs or alcohol. Plaintiff's (implicit) reasoning goes that if these employees were not disabled and were given Last Chance Agreements after problems with drugs or alcohol, this suggests that Plaintiff's termination was motivated by his disability, not his misconduct.

This argument fails for two reasons. First, Plaintiff has not demonstrated that these fifteen employees were not disabled. In fact, the only evidence in the record on this point is Plaintiff's own affidavit stating that these employees "also suffered from alcoholism." (R. 22-1, Blazek Aff., at 425.) Second, even assuming that none of these other employees was disabled, the facts of their cases differ significantly from Plaintiff's. Only three of the fifteen employees had their drug or alcohol incidents while reporting to the same supervisors who terminated Plaintiff. Although it is not an "inflexible requirement," this Circuit has noted that similarly situated employees will often have dealt with the same supervisor. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (internal quotation marks omitted). But more importantly, Plaintiff's infractions were significantly more serious than these other employees'

misdeeds. Many of the incidents involving these employees took place outside of work. And unlike for Plaintiff's position, a CDL does not appear to have been a requirement for these other employees' jobs. The employee most similar to Plaintiff was Thomas Bork, who received a Last Chance Agreement in December 1994 under which he agreed not to consume alcohol or drugs when employed by Defendant. But on May 18, 1999, Bork was found to be drunk and high while operating a backhoe at work. Bork was fired as a result of this second infraction.

Plaintiff admitted driving a City snowplow during a storm while intoxicated. Plaintiff further admitted that was not his only time drinking on the job. Plaintiff's violations of City policies dwarf those of the other employees whom Plaintiff offers up as comparisons. The most analogous is Bork, who also operated a City vehicle while drunk—and was fired. Even if we assume that none of these fifteen employees was disabled (and there is no reason to make this assumption), the facts of their cases are simply too different from the facts of Plaintiff's case to be of use. Plaintiff therefore cannot show that Defendant's legitimate reason for terminating him was pretextual.

## II.   FAILURE TO ACCOMMODATE

Next, Plaintiff asserts that Defendant failed to accommodate his disability by offering him a non-driving job or a Last Chance Agreement (which we will assume could qualify as an ADA accommodation). The discrimination proscribed by the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). The ADA further provides that "'reasonable accommodation' may include . . . reassignment to a vacant position." 42 U.S.C. § 12111(9)(B);

*see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869–71 (6th Cir. 2007). We analyze failure-to-accommodate claims via the following approach:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*E.E.O.C. v. Ford Motor Co.*, 752 F.3d 634, 640 (6th Cir. 2014) (internal quotation marks omitted).

We assume that Plaintiff was disabled and that a vacant non-driving position was available when he was terminated. Even with these elements established, Plaintiff's claim falls on the ground that he did not request *any* accommodation from Defendant prior to his termination. The first time that Plaintiff raised the possibility of moving to a non-driving position was during his union grievance, several months after he was fired. "Because Plaintiff made no request for accommodation the district court properly found that [he] failed to create an issue of fact as to whether or not the Company failed to reasonably accommodate [him]." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998); *see also, e.g.*, *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84–85 (6th Cir. 2012).

## CONCLUSION

For these reasons, we **AFFIRM** the district court in full.